LURETHA M. STRIBLING, ESQ.
1030 South Avenue West, Suite 1A
Westfield, New Jersey 07090
(908)403-0113
LMStribling@verizon.net
Attorney ID No. 008452004
Attorney for the Plaintiff

| | |
|---|---|
| CHRISTOPHER MORRIS<br><br>                              Plaintiff,<br><br>     v.<br><br>NEW JERSEY STATE POLICE, THE STATE OF NEW JERSEY, FIREARMS INSTRUCTOR HILLMAN IN OFFICIAL CAPACITY AND INDIVIDUALLY, JOHN DOES 1-10, JANE DOES 1-10, JOHN ROES 1-10, JANE ROES, 1-10, ABC CORPORATIONS A TO Z<br><br>                              Defendant. | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY<br><br>CASE NUMBER:<br><br>                     Civil Action<br><br><br><br>COMPLAINT AND JURY DEMAND |

Christopher Morris by way of Complaint against the State of New Jersey, The New Jersey State Police and Firearm Instructor William Hillman says:

## NATURE OF ACTION

1. This is a civil action brought as a result of discrimination based on race in violation of the civil rights conferred by the United States Constitution.

2. Plaintiff seeks redress for violations of 42 USC, Section 1981 (Section 1981), 42 USC Section 1983 (Section 1983), the Civil Rights Act of 1964, Title Seven as amended 42 USC Section 2000e et seq (Title Seven), the New Jersey Law Against Discrimination (LAD), the New Jersey Civil Rights Act and other common law torts.

## JURISDICTION AND VENUE

The United States District Court has original subject matter jurisdiction of the claims that come under Title Seven, Section 1981 and Section 1983 because these claims fall under the laws of the United States, 28 USC Section 1331. This court has jurisdiction of Title Seven, Section 1981 and Section 1983 under 28 USC Section 1343 because Plaintiff seeks redress and recovery

of damages for deprivation of rights conferred and privileges conferred as a result of being a citizen of the United States. Plaintiff seeks judicial relief for deprivation of rights and privileges under color of state law. Recovery is also sought in equity for violation of Civil Rights.

The United States District Court has supplemental subject matter jurisdiction of New Jersey state law claims because these claims arise from a common core of operative facts with the federal claims and are related to the federal claims as these claims form part of the same case or controversy under Article III of the United States Constitution.

Venue is proper in the judicial district under 28 USC Section 1391(b) and (c) and 42 USC Section 2000e-5(f)(3), because Defendants have an office, conduct business and can be found in this district and the causes of action arose and the acts and omissions complained of occurred here.

## ADMINISTRATIVE REMEDIES

Plaintiff has timely filed and complied with the prerequisites to filing Title Seven claims Plaintiff previously filed a claim with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a Right To Sue Letter.

## BACKGROUND

1. Christopher Morris (Morris or Plaintiff) resides in East Orange, New Jersey 07018.
2. The State of New Jersey is located at 125 West State Street in Trenton, New Jersey 08625.
3. The New Jersey State Police Superintendent is Colonel Patrick J. Callahan. Colonel Callahan is a member of Governor Murphy's cabinet.
4. The New Jersey State Police Division Headquarters is located at Post Office Box 7068 in West Trenton, New Jersey 08625.
5. John Does 1-10, Jane Does 1-10, John Roes 1-10, Jane Roes 1-10 and ABC Corporations A to Z are fictitious defendants who have not yet been identified but may be identified and named in this lawsuit at a later time.
6. Plaintiff applied for and was accepted into the New Jersey State Police Training Academy (Academy) and began his training on August 2, 2021.

7. Plaintiff completed 19 weeks of training at the New Jersey State Police Training Academy in Seagirt, New Jersey.

8. Plaintiff satisfactorily completed the required ballistic tests.

9. The rule at the New Jersey State Police Training Academy was that if a recruit received two Unsatisfactory scores, then, the recruit would be dismissed from the Academy.

10. During the nineteen weeks of training, Plaintiff did not receive any Unsatisfactory scores during his training.

11. Plaintiff was scheduled to graduate on December 23, 2021.

12. On December 7, 2021, Plaintiff and other recruits were taken to the shooting range for training with the use of rifles.

13. Of note, rifle training was not a requirement to graduate from the Academy.

14. At the shooting range, the instructor had the recruits stand 2 feet apart.

15. At the shooting range it was noted that there were no partitions between the recruits.

16. The partitions are called Berms and the Berms are supposed to be between each recruit and the recruits standing next to him.

17. Plaintiff had a recruit standing to his left and to his right with the distance between Plaintiff and the other recruits next to him being 2 feet apart.

18. Plaintiff and the other recruits were told that when the command was given, the recruits had to shoot simultaneously.

19. When the command was given, the recruit to the left of Plaintiff shot his rifle and a shell was ejected from the rifle.

20. The ejected shell went down the back of Plaintiff's shirt.

21. The shell was hot resulting in burning of Plaintiff's back.

22. Plaintiff had placed his hand on the trigger of his rifle and on command, Plaintiff shot his rifle which was at the very time that the shell casing went down his back.

23. The sudden burning caused Plaintiff to turn to the right and the bullet was discharged from his rifle.

24. A recruit standing to Plaintiff's right was grazed in the abdomen by the discharged bullet.

25. Plaintiff was immediately removed from the range and placed in a location away from the other recruits.

26. The recruit that was grazed in the abdomen was provided with first aid at the range. The recruit with the graze was then transported to the hospital for further examination.

27. The recruit that had been grazed had only a graze injury which healed. The recruit that had been grazed was able to continue with his training and he graduated from the Academy.

28. After the accident occurred on the shooting range, Plaintiff was removed from the range and was separated from the other recruits.

29. Personnel from Crime Scene were called to the Academy and interviewed the recruits.

30. Personnel from Crime Scene conducted an investigation of the accident.

31. Plaintiff sat for a recorded interview and was questioned by investigators.

32. At the conclusion of the interview, the investigators from Crime Scene told Plaintiff that he should not worry because the accident that happened on the range was a training accident.

33. The Major of Troop D spoke with Plaintiff and told Plaintiff that he should not worry because it was a training accident.

34. After Plaintiff sat for the interviews, he was told that he should just go back to training and be a good recruit.

35. Despite being told to go back to training, Plaintiff was picked up from the range and transported back to the Academy in Sea Girt, New Jersey.

36. Once back at the Academy Plaintiff spoke with Sergeant First Class Sussowitz who told Plaintiff that he could talk to someone at Law Enforcement Science West or he could go to his room and shine his gear.

37. Plaintiff had burns on his back, but, he was not provided with medical care from a nurse until the next day.

38. When Plaintiff had the medical visit the following day, he received treatment for the burns on his back. Ointment was applied to the burns which were then covered with gauze.

39. The following day, Plaintiff met with Executive Officer Lieutenant Gritelli (Gritelli) and Lieutenant Economou (Economou) who worked in the Employee Assistance Program.

40. During this meeting, Plaintiff was told by both men that they knew that he was going through something because it was his friend that had been grazed by the bullet.

41. Gritelli and Economou told Plaintiff that he could speak to someone regarding the training accident.

42. Later in the day after speaking with Gritelli and O'Connomo, Plaintiff met with Captain DelSantos who told Plaintiff that he knew that Plaintiff was going through something as a result of the accident on the shooting range. Plaintiff was told that he should let Captain DelSantos know if he needed anything.

43. The following day Plaintiff met with a Counselor at the Employee Assistance Program.

44. Plaintiff had been assured that he would be able to complete the training program to become a State Police Officer, a State Trooper.

45. On September 9, 2021, Plaintiff met with Firearms Instructor Hillman who had prepared paperwork which had been signed off by Captain De Los Santos.

46. Plaintiff was in class and was called to the back of the room and was told that he had to sign a document referred to as a RPF which documented the accident that had happened on the shooting range on December 7, 2021.

47. Plaintiff was told that he was being given an Unsatisfactory as a result of the accident on the shooting range. Firearms Instructor Hillman in criticizing Plaintiff told him that what he had done on the range was the same as going into a bar and drinking and then driving a car.

48. Plaintiff was not in agreement with the writing on the RPF as there was a failure to document the entire incident and the fact that a hot shell had gone down Plaintiff's back resulted in a reaction where Plaintiff had turned just as he had pulled the trigger of the rifle.

49. Plaintiff was told that he had to sign this RPF even though he did not agree with the details on this document. Plaintiff was assured that his signature on this document was only an acknowledgement that he had reviewed the RPF document.

50. Plaintiff asked the Firearms Instructor William Hillman if he was being discharged from the Academy and was told that he was not being discharged from the Academy.

51. After Plaintiff signed the RPF he was told that he should return to his class and continue to he a good recruit and Plaintiff returned to his class.

52. One hour after Plaintiff had returned to his class, he was asked to come out of the class and did so and was then told that he was being discharged from the Academy.

53. Plaintiff spoke with SFC Kappler and told him that he did not agree with the details on the RPF document that he had signed earlier in the day. SFC Kappler told Plaintiff to note on the dismissal papers that he did not agree with the details on the RPF document.

54. Plaintiff noted on the dismissal papers that he was not in agreement with the details on the RPF document.

55. The rule at the Academy was that a recruit would be discharged when the recruit had two Unsatisfactory scored. Of note, Plaintiff had received on Unsatisfactory score as a result of the accident on the shooting range.

56. The allegation made when dismissing Plaintiff from the Academy was that he did not practice proper gun safety. Plaintiff disagreed with this conclusion.

57. Per the New Jersey Department of Law and Public Safety Division of Criminal Justice Manual entitled the Basic Course Firearms Manual, the range master has specific responsibilities. Noted at the section entitled Duties and Responsibilities of the Range Master at page 8, the following information appears: "A Range Master is responsible for the safety of all individuals engaged in firearms activity." The Range Master is also responsible for "ensuring that a currently certified first aider is present at the range. This person should be an Academy instructor or police officer, certified as either an EMT or First Responder, or fully certified member of a local volunteer first aid squad" and "ensuring that adequate first aid supplies are available at all times." Basic Course Firearms Manual.

58. Plaintiff noted that on December 7, 2021, there were no first responders present at the range.

59. Plaintiff received treatment of the burns on his back the following day.

60. There was a failure to have in place safety measures on the shooting range.

61. Per the Division of Criminal Justice Police Training Commission Outdoor Firearms Range Facility Standards, a requirement for outdoor ranges is that berms be in place. Noted at page 2 of the Outdoor Firearms Range Facility Standards, there is a need to have in place Impact and Safety Berms. Noted at 2.1 where there is discussion of Impact Berms: "The impact berm for ranges with a 25-yard capacity limit should be at least 12 feet high, and for those with a 50-yard capacity limit, at least 20 feet high. These impact berms should be free from rocks, stones or objects that may tend to increase the possibility of ricochets."

62. In the Outdoor Firearms Range Facility Standards at point 2.2 the discussion is about side berms: "Both sides of the range should contain side berms for safety purposes. They should be at least 12 feet high and extend from the impact berm to the maximum shooting distance. Their primary purpose should serve to stop any misdirected rounds that may tend to travel slightly to

one side or the other either by accident or ricochet. These berms should not be used as impact berms."

63. There were no berms in place on December 7, 2021 when Plaintiff and other recruits were taken to the shooting range.

64. With representation of Counsel, after Plaintiff was terminated from the Academy, a letter was forwarded to Melanie Armstrong, DAG who provides representation for the New Jersey State Police.

65. Ms. Armstrong was apprised of Plaintiff's acceptance into the Academy and the accident that occurred at the Academy which resulted in Plaintiff's termination.

66. Ms. Armstrong was asked to reinstate Mr. Morris to the Academy.

67. Plaintiff was then notified that he could begin training at the Academy again in the next class which was going to start in early 2022.

68. Plaintiff had undergone the psychological examination which is a part of the preliminary steps to be admitted to the Academy.. The first psychological exam was done by Rachel Safran, PH.D. Dr. Safran tested Plaintiff on July 6, 2021 and interviewed him on July 8, 2021. Dr. Safran recommended Plaintiff for the position sought.

69 When Plaintiff began the preparation again to go to the Academy, he was notified that he had to undergo another psychological evaluation.

70. The psychological evaluation was done by Thomas Coghlan, Psy.D who tested Plaintiff on January 14, 2022 and interviewed Plaintiff on January 17, 2022. Dr. Coghlan wrote in his report that Plaintiff was not recommended for the position sought.

71. Plaintiff stated that there were 150 recruits when the training began at the Academy. Plaintiff stated that of the number of recruits, 25 of the recruits were Black.

72. Plaintiff stated that when the training Academy was near end that the recruits had been given their uniforms to prepare for the graduation, there were only 7 Black recruits remaining.

73. Plaintiff was subjected to discrimination treatment at the Academy which is in violation of the United States Civil Rights Act of 1964, Title Seven.

## COUNT ONE DISCRIMINATION BASED ON RACE IN VIOLATION OF THE UNITED STATES CIVIL RIGHTS ACT OF 1964, TITLE SEVEN AND THE NEW JERSEY LAW AGAINST DISCRIMINATION

74. Plaintiff repeats and reiterates each and every statement made under Background as if repeated at length herein in their entirety.

75. Plaintiff is African-American.

76. Colonel Patrick J. Callahan (Callahan) is Caucasian.

76. Firearms Instructor William Hillman is Caucasian.

77. Captain De Los Santos is Caucasian.

78. Lieutenant Gritelli is Caucasian.

79. Lieutenant Economou is Caucasian.

80. Meridith Abeles is Caucasian.

81. Plaintiff was accepted into the Academy on August 2, 2021. When Plaintiff began his training at the Academy he was an employee with the title of Recruit.

82. Plaintiff was in the 164th Class of the Academy.

83. The class size was 150 recruits. Of this number of recruits, there were 25 Black recruits.

84. During the period of time that Plaintiff was training at the Academy, he was subjected to discrimination which was based on race.

85. Plaintiff was criticized by those persons charged with training recruits. Trainer Ables in criticizing how Plaintiff spoke accused him of talking ghetto.

86. Plaintiff was told that he did not speak well which appeared to reference his race. The comments made were negative comments about Black people.

87. Training Instructor Meredith Abeles commented on Plaintiff's way of speaking and told him that he was talking ghetto.

88. Plaintiff was subjected to comments about his lack of intelligence. A Caucasian instructor at the Academy told Plaintiff that he was not speaking intelligently

89. Persons tasked with training him and other recruits repeatedly made comments about the fact that Plaintiff was from Newark.

90. Plaintiff witnessed the differential treatment that the recruits received which was based on race.

91. Plaintiff witnessed the favorable treatment that Caucasian recruits received as compared to unfavorable treatment that African-American/Black recruits received when being judged on the

same tasks.  It was common for a Caucasian recruit who did not do a good job with the assignment given to him to be given another chance. African-American recruits who did not do a good job on the same task were given Unsatisfactory and with two scores of Unsatisfactory were dismissed from the Academy.

92. Part of the training at the Academy included self defense training.  A Caucasian recruit named Anthony Molinari participated in the self-defense training which involved fighting with another recruit.  Molinari failed the fights that he engaged in during the self defense training, yet, he was scored as having passed the self defense training. When Black recruits failed the self defense training, the Black recruit received an Unsatisfactory and was marked as having failed the self defense training.

93. Another Caucasian recruit, Brittany Gugel  was given a pass even when she failed the self defense training.

94. Plaintiff noted that when Caucasian recruits were pared with another recruit for the self defense training, the Caucasian recruit was matched with another Caucasian recruit of the  same height and weight. Plaintiff noted that when he was paired with another recruit for the self defense training, the other recruit was always much taller than Plaintiff and heavier than Plaintiff.

95. Plaintiff witnessed the fact that Caucasian recruits were not subjected to criticism and were treated respectfully and given favorable grades which helped the Caucasian recruit complete the training at the Academy with ease.

96. The Training Instructors were heard commenting that they were going to get rid of more recruits and the suggestion appeared to be in reference to Black recruits.

97. At the start of the training at the Academy in August of 2021, there were 25 Black recruits. At the time of graduation from the Academy, there were on 7 Black recruits.

98. The New Jersey Monitor reporter Sophie Nieto-Munoz wrote an article  dated  November 11, 2022 which focused on how state troopers are trained; noted was  that between 2017 and 2022 some of the instructors had pending or substantiated Equal Employment Opportunity investigations while they were training recruits.  Watchdog finds fault with how state troopers are trained, New Jersey Monitor, November 11, 2022.

99. Plaintiff has been subjected to differential treatment based on race which is in violation of the United States Civil Rights Act of 164, Title Seven and the New Jersey Law Against Discrimination Plaintiff now seeks a remedy from the Court.

**WHEREFORE** Christopher Morris seeks damages from the Defendants, The State of New Jersey, the New Jersey State Police, William Hillman in his official capacity and individually, John Does 1-10, Jane Does 1-10, John Roes 1-10, Jane Roes 1-10 and ABC Corporations A to Z for violation of the United States Civil Rights Act of 1964, Title Seven , Section 1981, Section 1983 and the New Jersey Law Against Discrimination and seeks compensatory damages, consequential damages, punitive damages, attorney's fees per the fee shifting mechanism for violation of NJLAD, costs of suit and any and all other relief which the court deems to be equitable and proper.

## COUNT TWO  HOSTILE WORK ENVIRONMENT AND HARASSMENT IN VIOLATION OF THE UNITED STATES CIVIL RIGHTS ACT OF 1964, TITLE SEVEN AND THE NEW JERSEY LAW AGAINST DISCRIMINATION

100. Plaintiff repeats and reiterates each and every statement made under Background and Count One as if repeated at length herein in their entirety.

101. Plaintiff trained at the Academy to become a New Jersey State Trooper.

102. The training period at the Academy spanned from August 2, 2021 through to the date of December 9, 2021 for the Plaintiff.

103. Plaintiff was subjected to racially charged statements regarding the way that he spoke and was accused of speaking ghetto.

104. Plaintiff was exposed to repeat disparaging comments regarding the City of Newark which is where Plaintiff was from.

105. Plaintiff was subjected to harsh communications from some of the persons tasked with training the recruits.

106. Recruit Nash recognized the disrespect received by Plaintiff and witnessed Training Officer Abeles refer to Plaintiff's speech as talking ghetto.

107. The adverse comments made to Plaintiff and about Plaintiff made the environment in which Plaintiff was in where he was attempting to pass the training at the Academy hostile and he felt harassed.

108. Plaintiff had no avenue to make a complaint about his treatment and was aware of the fact that he might be subjected to retaliation if he reported the way that he was being treated and the comments being made to him.

109. Other recruits who witnessed the treatment that Plaintiff received referred to the negativity of the Training Officers.

110. The use of the wording speaking ghetto served to make the environment hostile.

111. The treatment that Plaintiff was subjected to was harassing. Plaintiff noted that when it came to self-defense courses, he was always paired with someone much heavier and taller than him. This increased the likelihood that he would fail and be dismissed from the Academy.

**WHEREFORE** Christopher Morris seeks damages from the Defendants, The State of New Jersey, the New Jersey State Police, William Hillman in his official capacity and individually, John Does 1-10, Jane Does 1-10, John Roes 1-10, Jane Roes 1-10 and ABC Corporations A to Z creation of a hostile work environment and harassment and seeks compensatory damages, consequential damages, punitive damages, attorney's fees per the fee shifting mechanism for violation of NJLAD, costs of suit and any and all other relief which the court deems to be equitable and proper.

                                             Luretha M. Stribling
                                             Luretha M. Stribling
                                             Attorney for the Plaintiff

DATED: October 18, 2025

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues triable in this case.

### DESIGNATION OF TRIAL COUNSEL

Trial counsel in this matter is Luretha M. Stribling.

**CERTIFICATION OF NO OTHER ACTIONS OR PARTIES**

I hereby certify that there are no other parties known at this time who should be included in this litigation.

**DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS**

Demand is hereby made for production of insurance agreements held by any and all insurance providers who supply insurance coverage to your business who may bear liability for the claims documented in this litigation. Please forward a copy of each and every insurance policy to this counsel upon receipt of this request.

LURETHA M. STRIBLING, LLC

1030 SOUTH AVENUE WEST, SUITE 1A

WESTFIELD, NEW JERSEY 07090

*Luretha M. Stribling*

LURETHA M. STRIBLING

Attorney for the Plaintiff

DATED: October 18, 2025